IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LOIS BROWN, on behalf of )
M.J.A.B., )
  )
       Plaintiff, )
  )
    v. )    CIVIL ACTION NO. 1:11cv859-TFM
  )            (WO)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
  )
       Defendant. )

## MEMORANDUM OPINION

## I. PROCEDURAL HISTORY

     This case is about a child with a troubled history: (1) his birth mother suffered from

a drug addiction; (2) he was dropped on his head as an infant; (3) he was diagnosed with

shaken-baby syndrome; and (4) he has struggled throughout most of elementary school,

despite receiving special education accommodations from teachers and the guidance of his

college-educated grandmother and guardian.  (R. 281.)  The plaintiff, Lois Brown, filed this

lawsuit on behalf of her minor grandchild, M.J.A.B., challenging a final judgment by

Defendant Michael J. Astrue, Commissioner of Social Security, in which he determined that

M.J.A.B. is not "disabled" and, therefore, not entitled to child supplemental security income

benefits.  On June 3, 2008, the plaintiff filed on behalf of M.J.A.B. an application for

supplemental security income benefits.  The plaintiff's application was denied at the initial

administrative level.  The plaintiff then requested and received a hearing before an

Administrative Law Judge ("ALJ").   Following the hearing, the ALJ determined that

M.J.A.B. is not disabled. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The parties have consented to the undersigned United States Magistrate Judge rendering a final judgment in this lawsuit. The court has jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2] Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

## II.  STANDARD OF REVIEW

An individual under 18 is considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I) (1999). The sequential analysis for determining whether a child claimant is disabled is as follows:

1.      If the claimant is engaged in substantial gainful activity, [s]he is not disabled.

2.      If the claimant is not engaged in substantial gainful activity, the

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[2] Title 42 U.S.C. §§ 405(g) and 1383(c)(3) allow a plaintiff to appeal a final decision of the Commissioner to the district court in the district in which the plaintiff resides.

Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment. If the claimant's impairment is not severe, [s]he is not disabled.

3. If the impairment is severe, the Commissioner determines whether the impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies this requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments are not medically equal, or functionally equivalent in severity to a listed impairment, the child is not disabled. *See* 20 C.F.R. § 416.924(d)(2) (1997). In determining whether a child's impairment functionally equals a listed impairment, an ALJ must consider the extent to which the impairment limits the child's ability to function in the following six "domains" of life: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1279 (11th Cir. 2004); 20 C.F.R. § 416.926a(b)(1). A child's impairment functionally equals a listed impairment, and thus constitutes a disability, if the child's limitations are "marked" in two of the six life domains, or if the child's limitations are "extreme" in one of the six domains. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d).

In reviewing the Commissioner's decision, the court asks only whether his findings concerning the steps are supported by substantial evidence. *Dyer v. Barnhart,* 395 F.3d

1206, 1210 (11th Cir. 2005).  Substantial evidence is "more than a scintilla," but less than a

preponderance: it "is such relevant evidence as a reasonable person would accept as adequate

to support a conclusion."  *Crawford v. Comm'r of Soc. Sec., 3*63 F.3d 1155, 1158–59 (11th

Cir. 2004) (quotation marks omitted).  The court "may not decide the facts anew, reweigh

the evidence, or substitute  . . . [its] judgment for that of the [Commissioner]." *Phillips v.*

*Barnhart,* 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004) (alteration in original) (quotation marks

omitted).    The  court  must,  however,  conduct  an  "exacting  examination  of  the

[Commissioner's] conclusions of law." *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.

1990).

### III. INTRODUCTION

#### A.  The Commissioner's Decision

M.J.A.B.  was  11  years  old  at  the  hearing  before  the  ALJ.   (R. 47.)   The  plaintiff

alleges that, on August 1, 2003, M.J.A.B. became disabled due to depression, attention deficit

hyperactivity disorder, lower intelligence, speech therapy, and slow learning. (R. 39-40, 206.)

The  ALJ,  in  his  opinion,  followed  the  regulations'  three  steps  as  listed  above  when  he

analyzed M.J.A.B.'s claim.  After doing so, he concluded that M.J.A.B. is not disabled and,

therefore, denied her claim for supplemental social security benefits.  Under the first step,

the ALJ found that M.J.A.B. is not engaged in substantial gainful activity.  At the second

step, the ALJ found that M.J.A.B. has severe impairments of attention deficit hyperactivity

disorder  (ADHD),  anxiety  disorder,  borderline  intellectual  functioning,  and  a  learning

disorder.   (R. 14.)   At step three, the ALJ found that M.J.A.B.'s impairments, when

4

considered singularly or in combination, do not meet or medically equal in severity the criteria for any impairment listed at 20 CFR, part 404, Subpart P, Appendix 1, including Listing 112.05, Mental Retardation.  (R. 14-15.)

In addition, the ALJ concluded that M.J.A.B.'s impairments do not functionally equal a Listing.  (R. 15-24.)  Specifically, the ALJ found that M.J.A.B. has "a marked limitation in the domain of acquiring and using information."  (R. 19.)  Relying on assessments by Dr. Simpson and Dr. Jordan, teachers, and standardized test scores, the ALJ determined that M.J.A.B. reads below his grade level, requires special education assistance in the classroom, and has received full scale IQ scores between 55 and 79 on multiple administrations of the WISC intelligence test.  (R. 19.)   However, because "his IEP report for the 2008-2009 school year stated that the [Comprehensive Test of Nonverbal Intelligence (CTONI)] was used as a result of verbal and nonverbal discrepancies on other IQ testing" and the results of the CTONI "showed that the claimant obtained a standardized test score of 86, a pictorial IQ of 79 and a geometric IQ of 96," the ALJ found that M.J.A.B.'s functional limitations were marked and not extreme.  (*Id.*)

The ALJ concluded that M.J.A.B. has "less than marked limitation in attending and completing tasks."  (R. 20.)  He further concluded that M.J.A.B. has no limitation in the domains of interacting and relating to others, moving about and manipulating objects, and health and physical well-being. (R. 20-24.)  The ALJ concluded that M.J.A.B. does not have an extreme limitation in one area of functioning, nor does he have a marked limitation in two areas of functioning.  (R. 24.)  Consequently, the ALJ determined that M.J.A.B. is not

disabled.  (R. 25.)

## B.  The Medical and School Records

In February 2005, Dr. Randall Jordan, a psychologist, conducted a psychological evaluation of M.J.A.B.  (R. 281-282.)  M.J.A.B.'s grandmother reported that M.J.A.B. is behind academically, has attention problems, and that "on birth mother's side of the family there is a lengthy history of mental illness, mental retardation, crack use, etc."  (R. 281.) During the evaluation, M.J.A.B. took the Weschler Intelligence Scale for Children, Third Edition ("WISC-III").  On the WISC-III, he achieved a verbal IQ score of 81, a performance IQ score of 81 and a full scale IQ score of 79.  (R. 282.)  Dr. Jordan found:

> Overall, a more aggressive approach to treatment would be initiation of stimulant medications.  It is very difficult to ascertain if this child has low IQ or ability and this is making him inattentive or if he is inattentive and this is making cognition difficult.  It may be one of those questions that really cannot be answered unless treatment is initiated.

(R. 282.)  Dr. Jordan's diagnostic impression was attention deficit disorder, provisional, and borderline intellectual functioning, provisional. (*Id*.)

During the 2005-2006 school year, M.J.A.B. was reevaluated for special education services.  (R. 242-248.)  Upon reviewing the results of testing, classroom observation, and work samples, school officials determined that M.J.A.B. was eligible to receive special education services for his specific learning disabilities.  (R. 248.)  His records reflect that he "had to constantly be reminded to attend to the tasks at hand [and] would call words without sounding them out and had trouble blending sounds into words."  (R. 244.)  In addition, his work samples included "[m]ostly failing grades across all academic areas and [p]oor

6

handwriting skills."  (R. 245.)

In February 2006, M.J.A.B. had a psychological evaluation by Dr. David C. Ghostley, a consultative psychologist.  (R. 287-288.)  Dr. Ghostley noted:

> Today, his grandmother presented with a WISC-IV evaluation that shows his Full-Scale IQ to be 59 (Extremely Low Range).  The WISC-IV test results also indicate composite scales as follows: Verbal Comprehension-59, Perceptual Reasoning-71, Working Memory-74, and Processing Speed-73.  [M.J.A.B.] was also diagnosed with Learning Disorder NOS.  It is also noteworthy that his non-verbal intelligence was measured at 86 which places him in the Low Average Range there.

(R. 287.)  Dr. Ghostley's diagnostic impression was Learning Disorder NOS and borderline intellectual functioning, rule out mild mental retardation.  (R. 288.)  Dr. Ghostley also found that "[M.J.A.B]'s ability to function in an age-appropriate manner, cognitively, communicatively, socially, adaptively, behaviorally, and in concentration, persistence, and pace is moderately to markedly impaired by Mental Slowness and Learning Disabilities." (Id.)

During the first quarter of second grade, M.J.A.B. received a B in Reading, a C in Mathematics, a D in Language and Spelling, and an N in Writing.  (R. 256.)  Over the course of the 2007-2008 academic year, however, his grades steadily improved.  M.J.A.B. received A's and B's during the third and fourth quarters of school.  (*Id*.)

On January 25, 2007, M.J.A.B. sought treatment from his pediatrician, Dr. Jeffrey Tamburin, for an "ADD/ADHD follow up."  (R. 295.)  The grandmother reported that M.J.A.B. was doing "much better on Adderall" and that his grades were improving.  (R. 295.)  Dr. Tamburin assessed attention deficit disorder with hyperactivity and prescribed a

thirty-day supply of Adderall XR. (*Id*.)  During a well-child exam on August 28, 2007,

M.J.A.B.'s grandmother reported that M.J.A.B. was a "slow starter in second grade." (R.

298.)  Dr. Tamburin assessed:

> 314.01 - Attention Deficit Disorder w/Hyperact.  The patient's status
> has improved.  The patient's quality of school work is consistent and
> unchanged, has signs consistent with normal appetite and no significant weight
> loss noted, has normal sleep patterns with no difficulty sleeping, demonstrates
> normal behavior at school, displays normal and appropriate behavior at home.
> The patient uses currently prescribed medication(s) on weekdays only.

(R. 299.)

During a follow-up appointment with Dr. Tamburin on October 24, 2007, M.J.A.B's

grandmother reported the following history:

> . . . [M.J.A.B.] was off medication over the summer.  Has now gone 3 months
> of school off medications and not doing well.  He is fidgety and inattentive and
> not following directions.  Teachers say he is horribly behind.  When he is on
> the medication he does really really well.  A student.  Eats and sleeps fine on
> medication.

(R. 300.)  Dr. Tamburin's assessment was attention deficit disorder with hyperactivity.  (*Id*.)

Dr. Tamburin determined that M.J.A.B. should restart his prior dosage of Adderall and

encouraged his grandmother to "keep follow ups and to keep up with his meds so we do not

get so far behind in school."  (*Id*.)

In third grade, M.J.A.B. was reevaluated for special education services.  (R. 231-241.)

The IEP team determined that, during the 2008 to 2009 school year, M..J.A.B. should receive

at least 60 minutes of special education services in both Mathematics and Reading in the

class room each day and 30 minutes of small group instruction in the resource room between

one and five times per week in Mathematics as needed.  (R. 233-234.)  In addition, the team

determined that M.J.A.B. should receive the following accommodations: (1) proximity

seating; (2) extended length of time for assignments; (3) shorter assignments; (4) frequent

checks for understanding; and (5) tests read orally in all subject areas as needed.  (*Id.*)

On March 21, 2008, M.J.A.B. returned to Dr. Tamburin for a follow-up appointment,

complaining of behavior problems.  (R. 302.)  Dr. Tamburin found:

> . . . The patient's status has improved.  The patient's quality of school work
> is improved, behavior at school has improved, displays normal and appropriate
> behavior at home.  Meds help him focus and help with hyperactivity.  He is
> followed by Jeff Justice for counseling.  That is helping.  Gmom thinks that he
> may have some learning disability.  School and Jeff Justice doing some testing.
> Gmom says he is getting meds regularly.  Not sure how that is possible since
> he has had only two Rx's since October 2007.

(*Id.*)  Dr. Tamburin prescribed Adderall and recommended that M.J.A.B. continue to receive

counseling.  (*Id.*)

On May 30, 2008, M.J.A.B. had a psychological evaluation by Dr. Robert S. Kline

III, a clinical psychologist.[3]  (R. 304.)  M.J.A.B. was administered the WISC and the

Woodcock-Johnson Tests of Academic Achievement ("WJ").  On the WISC, M.J.A.B.'s

scores ranged from low average to extremely low ranges.  (R. 304-305.)  For example, he

achieved a verbal score of 59, a perceptual reasoning score of 77, a working memory score

of 65, and a processing speed score of 85.  (R. 305.)  His full scale IQ score was 65, which

places him in the extremely low range of functioning with the score falling in the first

---

[3] In his report, Dr. Kline noted that he did not conduct a formal diagnostic and clinical interview with
M.J.A.B.  (R. 304.)

percentile of his peer group. (*Id.*) Dr. Kline found that "it is believed that his overall score represents little more than a mathematical average of his vastly fluctuating abilities in the component areas." (*Id.*) On the WJ, Dr. Kline found that M.J.A.B.'s low-range scores were "generally consistent with overall academic difficulty and specifically with learning problems in math and both receptive and expressive written language." (R. 306.)

On July 9, 2008, M.J.A.B. went for an initial visit with Dr. Murtuza Kothawala, a pediatric neurologist, at Southeast Neurology. (R. 366.) Dr. Kothawala reviewed Dr. Kline's testing and determined that M.J.A.B's IQ score appeared to be around 67. (R. 366-367.) Upon conducting an examination, Dr. Kothawala assessed a "10-year-old boy with mild to moderate cognitive impairment, ADHD, and possible depression. . . . The probable cause of the cognitive impairments is this boy could be either genetic abnormality, prenatal or postnatal injury, which can result in mild to moderate cognitive impairment." (R. 367.) The neurologist recommended that M.J.A.B. continue taking Adderall and Paxil. (*Id.*)

On July 9, 2008, M.J.A.B. also went to Southeast Psychiatric Services for an initial evaluation. (R. 335.) Dr. Meghani's assessment was a learning disorder; attention deficit disorder by history; rule out Depression Disorder; and questionable head injury/shaken baby as a child. (R. 339.) The psychiatrist prescribed Paxil. (*Id.*) On July 26, 2008, M.J.A.B. returned to Dr. Meghani for a follow-up examination. The psychiatrist noted M.J.A.B.'s symptoms of depressive disorder had improved. (R. 334.)

M.J.A.B. returned to Dr. Kothawala's office for a follow-up visit on August 8, 2008. (R. 368.) The grandmother reported that M.J.A.B. was taking his medication and attending

school in special education classes.  (*Id.*)  She expressed her concerns about his loss of appetite and decreasing grades.  (*Id.*)  Dr. Kothawala noted that an MRI and EEG were normal, assessed ADHD and mild cognitive impairment, and recommended that he continue taking his medication.  (*Id.*) On September 8, 2012, M.J.A.B.'s father reported that "if [M.J.A.B.] is off the medication he becomes very hyperactive and he is not able to concentrate in school." (R. 364.) Dr. Kothawala assessed ADHD, mild anxiety disorder, and mild cognitive impairment.  (*Id.*)

On September 12, 2008, M.J.A.B. returned to Dr. Meghani's office.  M.J.A.B.'s grandmother reported that M.J.A.B. communicates better and that his teacher notices a difference in his attention span when he is taking Adderall.  (R. 332.)

During a well-checkup at Dothan Pediatric Clinic on September 19, 2008, a nurse practitioner noted "[n]o academic problems, no behavior problems at school or at home." (R. 346.) The practitioner assessed adjustment disorder, NOS, attention deficit disorder with hyperactivity, and learning difficulties.  (R. 347.)

During a follow-up appointment with Dr. Kothawala on October 17, 2008, M.J.A.B.'s father reported that M.J.A.B. was performing better in school.  (R. 362.)  Dr. Kothawala assessed ADHD and mild anxiety and recommended that M.J.A.B. continue taking Adderall and Paxil.  (*Id.*) On November 17, 2008, M.J.A.B.'s father reported that M.J.A.B. was doing well in school.  (R. 358.)  Dr. Kothawala assessed ADHD and mild anxiety and recommended that M.J.A.B. continue taking his medication.  (*Id.*)  In December 2008, M.J.A.B.'s grandmother reported that M.J.A.B. was having problems with Mathematics. (R.

360.)  Dr. Kothawala recommended that M.J.A.B. continue taking Adderall and Paxil and "discussed about Mathematics and dyslexia." (*Id.*)

Achievement tests from March 2009 indicate M.J.A.B. scored at "Level II (Partially Meets Standards)" in Reading and "Level I (Does Not Meet Standards)" in Mathematics. (R. 257.)  On the Stanford Achievement Test, he scored in the 11th percentile in Reading, the 4th percentile in Mathematics, and the 2nd percentile in Language. (*Id.*)

M.J.A.B. returned for a follow-up appointment with Dr. Kothawala on April 24, 2009. (R. 354.)  The neurologist assessed ADHD, Cognitive Impairment, and Anxiety and recommended that M.J.A.B. continue taking Adderall, Paxil, and Periactin. (*Id.*)

During a well check-up at Dothan Pediatric Clinic on November 11, 2009, a nurse practitioner noted that M.J.A.B. was "[i]n 4th grade but not doing well academically, no behavior problems noted at school or at home.  Attends special education.  Receives ST and OT." (R. 342.)  The practitioner assessed learning difficulties and attention deficit disorder without hyperactivity and recommended that M.J.A.B. continue taking Adderall and Paxil. (R. 343.)

On December 17, 2009, M.J.A.B. returned to Dr. Kothawala's office. (R. 356.)  His grandmother reported that M.J.A.B. "is doing very well in school and his medication is working." (R. 356.)  Dr. Kothawala recommended that M.J.A.B. continue taking his medication. (*Id.*)

Between June 2008 and December 2009, Jeffery C. Justice, MS, LPC, provided counseling to M.J.A.B. on a routine basis. (R. 383-398.)  The counselor diagnosed

12

adjustment reaction NOS and hyperkinesis with developmental delay.  (*Id*.)  On several

occasions, the counselor noted that M.J.A.B. was passing academically with accommodations

in Math and Reading.  (*Id*.)  In a letter dated May 14, 2010, the counselor stated that

"M.J.A.B. appears to have a mood disorder with features associated with depression as well

as anxiety and possibly complications with delayed grief and bereavement regarding his

maternal great-grandmother who he was very close to passing away."  (R. 415.)  In addition,

the counselor stated:

> [M.J.A.B.] is attending Jerry Fain Elementary School in the 4th grade.
> He is in special education and also receives accommodations with his having
> his most academic difficulty with math.  He has had additional tutoring and
> assistance from teachers as well as his paternal grandmother, who is a college
> graduate, in trying to assist him with multiplication and division problems to
> no avail as he appears to lack adequate progress in this area.  Possibly,
> [M.J.A.B.] may have math as a learning disability.

(*Id*.)  The counselor concluded that M.J.A.B. "does appear to have a psychiatric disorder of

a mood disorder, also having difficulty with academics within the school system, and overall

functioning within the home and family, with his peer group, as well as the community.  As

I have seen [M.J.A.B.] bi-monthly, as his grandmother is very responsible in ensuring that

he makes his bi-monthly individual and family appointments, it would be this clinician's

opinion that without ongoing mental health services, [M.J.A.B.] would regress and

deteriorate as far as his mental well-being and his overall functioning."  (R. 416.)

During the 2010-2011 academic year, school officials reevaluated whether M.J.A.B.

should continue to receive an individualized education program.  School officials found:

> . . . [M.J.A.B's] teacher, Ms. Salter, reports that [M.J.A.B.] is a very

quiet and polite young man.  His peers like him and he gets along well with others.  She also states that [M.J.A.B.] requires constant prompts to maintain focus and complete his assignments.  She feels that [M.J.A.B.] is capable of demonstrating better on task behaviors with a little maturity.  Ms. Salter feels that [M.J.A.B.] will continue to need extra support to remain successful in the general classroom setting.

[M.J.A.B.]'s independent level in reading is slightly below grade level. [M.J.A.B.] benchmarked on his fourth grade DIBELS.  The most recent ThinkLink data reveal that [M.J.A.B.] is proficient on most reading content standards at the fourth grade level. [M.J.A.B.] performs well with decoding but struggles to comprehend questions associated with reading assignments, directions, and tasks; especially those that require written responses.  His difficulty with reading comprehension adversely affects his ability to comprehend reading related content areas across the curriculum.  He will require extra assistance on some assignments in the general education classroom.

Math is [M.J.A.B.]'s weakest area.  Classroom based performance reveal that [M.J.A.B.] is not proficient with numbers/operations and data/probability at the fourth grade level.  Most recent STAR Math test scores reveal [M.J.A.B.] scores approx. 1.9-2.0GE. These scores suggest Michael is in an early state of learning basic math skills.  He continues to need concrete objects such as counters, number lines, and/or Touch Points to work math problems. . . .

(R. 272.)  The IEP team recommended that, in both Reading and Mathematics, M.J.A.B. should receive 45 minutes of special education services, 45 minutes of supplementary aids and services, and 45 minutes of accommodations.  (R. 274-277.)

On February 11, 2010, M.J.A.B. had a psychological evaluation by Dr. Randall Jordan, a consultative psychologist.  (R. 401-402.)  Dr. Jordan found as follows:

. . . Speech was understandable at 100% and did not reflect pressured processes but was "soft" in nature.  Affect was stable but was congruent with mood, which might be described as pleasant but shy but appropriate to situation.  General concentration and memory skills appeared intact.  Fund of information . . . seemed somewhat below average based on baseline mental

status questions.  Abstractions were somewhat concrete as the claimant could say how simple items such as a banana and orange were similar and different but not more complex ones such as work and play.  Intelligence is estimated to be in the Borderline range based on interview.

(R. 402.)  On the WISC-IV, he achieved a verbal IQ score of 61, a performance IQ score of 69, a working memory IQ score of 65, and a full scale IQ score of 62.  (R. 403.)  On the Wide Range Achievement Test-III, he received an 82 in Reading, an 80 in Spelling, and a 54 in Arithmetic.  (*Id*.)  Dr. Jordan also found that in the domains of development or functioning, M.J.A.B has marked ability to acquire and use information, attend and complete tasks, and care for oneself, less-than-marked ability to interact and relate with others, and no limitation in moving and manipulating objects or physical well-being.  (R. 405-407.)  Dr. Jordan determined:

> Scores are consistent with Dr. Kline's report in 2008 that language based achievement scores are much better than arithmetic.  Overall, language achievement is much better than intelligence scores.
>
> Overall, his functional abilities and achievement scores would point towards borderline abilities than mentally retarded levels of achievement.  It may be that his shy nature prohibits his overall performance in the more verbally and interactive intelligence test setting.
>
> Daily Living Skills are somewhat compromised by intellectual function.  Psychiatric function does not interfere with these tasks.  These skills are not compromised by the claimant's physical function.  Activities of daily living such as bathing and grooming are not limited.  Socially, the claimant functions in a fairly normal manner per self-report.  The claimant spends the majority of [his] day playing and at school.  Overt social skill problems are not noted.

(R. 403.)  Dr. Jordan's diagnostic impression was attention deficit disorder, impulsive subtype; and borderline intellectual functioning "based on functional performance and

15

achievement test, intelligence certainly falls in MR range." (*Id.*) Dr. Jordan also determined that "[i]ntelligence issues are and will be problematic" and that "[c]ontinued psychiatric and medical care is needed." (R. 404.)

On March 3, 2010, Dr. Kline conducted an additional psychological evaluation. (R. 418-424.) Dr. Kline noted that M.J.A.B. "appeared slightly depressed" and "overtly anxious" and that he was taking his medication as prescribed. (R. 420, 423.) During the evaluation, M.J.A.B. took the WISC-IV and the Woodcock-Johnson Tests of Academic Achievement. (R. 422-423.) On the WISC-IV, he achieved a verbal IQ score of 65, a perceptual reasoning IQ score of 59, and a full scale IQ score of 55. (R. 422.) Dr. Kline assessed:

> [M.J.A.B.] may experience great difficulty in keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities. His ability to think with words is comparable to his ability to reason without use of words. Both Michael's verbal and nonverbal reasoning abilities are in the Extremely Low range. He performed slightly better on verbal than on non-verbal reasoning tasks, but there is no significant meaningful difference between [M.J.A.B.'s] ability to reason with and without the use of words.

(R. 421.) Dr. Kline also found that M.J.A.B.'s ability to sustain attention, concentrate, and exert mental control is in the borderline range and that his ability to process simple or routine visual material without making errors is in the extremely low range when compared to his peers. (R. 422.) Dr. Kline's diagnostic impression was adjustment disorder, mixed, complicated bereavement; math disorder; and mild mental retardation. (R. 424.) Dr. Kline recommended that M.J.A.B. continue with his established regimen of psycho tropic medication and counseling. (*Id.*)

On March 16, 2010, M.J.A.B. returned to Dr. Kothawala for a follow-up visit. The grandmother reported that M.J.A.B. continued to have problems in school and was struggling with mathematics. (R. 412.) Dr. Kothawala assessed ADHD, mild cognitive impairment, and anxiety disorder and recommended that M.J.A.B. continue taking his medication. (R. 413.)

In a letter dated May 14, 2010, M.J.A.B.'s counselor advised:

> [M.J.A.B.] is attending Jerry Fain Elementary School in the 4th grade. He is in special education classes and also receives accommodations with his having his most academic difficulty with math. He has had additional tutoring and assistance from teachers as well as his paternal grandmother, who is a college graduate, in trying to assist him with multiplication and division problems to no avail as he appears to lack adequate progress in this area. . . .

(R. 415.) The counselor also assessed:

> [M.J.A.B.] does appear to have a psychiatric disorder of a mood disorder, also having academics within the school system, and overall functioning within the home and family, with his peer group, as well as the community. As I have seen [M.J.A.B.] bi-monthly individual, as his grandmother is very responsible in ensuring that he makes his bi-monthly and family appointments, it would be this clinician's opinion that without ongoing mental health services, [M.J.A.B.] would regress and deteriorate as far as his mental well-being and overall functioning. [M.J.A.B.] could suffer greatly without his medications and the stability, safety, and permanency that is trying to be provided by his paternal grandmother, Lois Brown.

(R. 416.)

On September 30, 2010, Dr. Fred George, a clinical psychologist, conducted the Vineland Adaptive Behavior Scales II testing. (R. 510.) Dr. George noted that the plaintiff's response to the testing was appropriate and the grandmother's responses were "likely a realistic representation of [M.J.A.B.'s] adaptive behavior." (*Id.*) Dr. George assessed an Adaptive Behavior Composite of 61, which falls below the 1st percentile in the mildly

17

retarded range of functioning.  (*Id*.)

## III.  ISSUES

The plaintiff presents the following issues for this court's review:

(1)    Whether the ALJ erred as a matter of law by failing to properly evaluate M.J.A.B.'s mental condition pursuant to C.F.R. part 404, Subpart P, Appendix 1 § 112.05D.

(2)    Whether the ALJ erred by discrediting every treating and examining psychologist as well as M.J.A.B.'s counselor.

(Pl's Br., Doc. # 12, p. 1).

## IV.  DISCUSSION

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence.  *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the Commissioner erred as a matter of law, and thus, this case is due to be remanded for further proceedings.  Specifically, the court finds that the Commissioner failed to properly evaluate whether M.J.A.B. meets Listing 112.05 at Step Three of the sequential evaluation.

The plaintiff argues that the ALJ erred as a matter of law by failing to properly consider whether M.J.A.B. has significantly subaverage general intellectual functioning with deficits in adaptive behavior.  The court agrees.

At Step Three, the ALJ determined:

The claimant's impairments do not meet the requirements of Listing 112.02, 112.05 or 112.06. William H. Simpson, Ph.D. opined that the claimant has neither met nor equaled any listing. (Exhibit 7F). The claimant does not have marked limitations in two of the following: age-appropriate cognitive/communicative function; age-appropriate social functioning; age appropriate personal functioning; and concentration, persistence, or pace.

With regard to Listing 112.05, the claimant's IQ testing also fails to support the requirements of Listing 112.05. The claimant also had multiple administrations of the WISC intelligence test. However, during administrations of the Wechsler Intelligence Test for Children (WISC) he obtained a full scale IQ of 79 in 2005, a full scale IQ of 61 in 2006, a full scale IQ of 65 in 2008, a full scale IQ score of 62 in 2010, and a full scale IQ score of 55 also in 2010 (Exhibits 1F, 6F, 9F, 15E, 16F, and 20F). However, a Comprehensive Test of Nonverbal Intelligence (CTONI) showed that the claimant obtained a standardized score of 86, a pictorial IQ of 79, and geometric IQ of 96. His IEP report for the 2008-2009 school year stated that the CTONI was used as a result of the verbal and nonverbal discrepancies on other IQ testing (Exhibit 15E). Moreover, Randall Green Jordan, Psy.D. also, following the February 2010 administration of the WISC, diagnosed the claimant as having only borderline intellect based on his functional performance and achievement tests despite the intelligence testing administered during his examination of the claimant (Exhibit 16F). The claimant's 2008 and 2010 Individualized Education Plans (IEP) both show that the claimant required only resource room, small group instruction in 2008 for math. His 2010-2011 assessment shows that the claimant will receive all special education accommodations in the regular class room (Exhibit 15E and 21E). The claimant's mental impairment does not cause the required deficits in adaptive functioning to meet the requirements of Listing 12.05. Moreover, the CTONI scores show clearly that he is not functioning at the mentally retarded level.

(R. 14-15.)

"The structure for mental retardation (112.05) . . . is different from that of the other mental disorders." 20 C.F.R. Pt. 220, App. 1, 112.05 MENTAL DISORDERS. Listing 112.05 contains an introductory paragraph with the diagnostic description for mental retardation.

The Listing defines mental retardation as follows:

112.05 *Mental Retardation*: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive behavior.
The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. . . .

D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function; . . .

20 C.F.R. Pt. 404, Subpt. P App. 1, Listing 112.05(D).

Consequently, a claimant meets the strictures of 112.05(D) by presenting evidence of (1) significantly sub-average intellectual functioning with deficits in adaptive behavior; (2) a valid IQ score of 60 to 70 inclusive; and (3) evidence of an additional mental or physical impairment that imposes an additional and significant limitation of functioning. In this Circuit, it is presumed that "mental retardation is a condition that remains constant throughout life." *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir. 2001). *See also Burt v. Barnhart*, 151 Fed. App. 817, *2 (11th Cir. 2005).

First, the Commissioner concedes M.J.A.B.'s IQ scores below 70 are valid. (Def's Br., p. 9.) In addition, the record establishes that M.J.A.B's IQ scores have gradually worsened over the course of his childhood. For example, in 2005, M.J.A.B. achieved a full scale IQ score of 79. (R. 282.) However, in 2006, his full scale IQ score fell to 59. (R. 287.) In 2008, he achieved a full scale IQ score of 65. (R. 305.) In 2010, his full scale IQ score dropped to 62. (R. 282, 287, 305, 403.) In addition, Dr. Robert Kline III, a clinical psychologist, noted that M.J.A.B's full-scale IQ score of 65 was an accurate refection of his current abilities. (R. 304.) Thus, there is substantial evidence in the record establishing that

M.J.A.B. has a valid full-scale IQ score which falls within the 60 through 70 range.

The Commissioner also concedes that M.J.A.B. suffers from an additional mental or physical impairment that imposes an additional and significant limitation of functioning. In his analysis, the ALJ found that M.J.A.B. has severe impairments of attention deficit disorder, anxiety disorder, borderline intellectual functioning, and learning disorder. (R. 14.) The record also indicates that M.J.A.B. suffers from depression and adjustment disorder, mixed, complicated bereavement, and that he has taken antidepressant medication on a routine basis since the death of his great-grandmother. (R. 424.) Thus, M.J.A.B. meets the subsection (D) requirement of Listing 112.05.

The parties disagree on whether M.J.A.B. has demonstrated *additional deficits in adaptive functioning* in accordance with the introductory paragraph. Deficits in adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community settling." DSM IV at 42. Deficits in this area must be "significant" to meet Listing 112.05. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05.

When determining that M.J.A.B. "does not have marked limitations in two of the following: age-appropriate cognitive/communicative function; age-appropriate social functioning; age appropriate personal functioning; and concentration, persistence, or pace" (R. 14), the ALJ improperly conflated his assessment of whether M.J.A.B. *meets or medically equals* Listing 112.05 with a determination of whether he *functionally equals* the

Listing.

The ALJ also failed to set forth sufficient reasons for finding that "the claimant's mental impairment does not cause the required deficits in adaptive functioning to meet the requirements of Listing 12.05."[4]  The ALJ merely concludes that "the claimant does not have marked limitations in two of the following: age-appropriate cognitive/communicative function; age-appropriate social functioning; age appropriate personal functioning; and concentration, persistence, or pace." (R. 14.)  In doing so, the ALJ wholly fails to articulate his specific reasons for determining that M.J.A.B. does not have additional deficits in adaptive functioning.  The Commissioner is tasked with the responsibility to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same" in disability cases. *Heckler v. Campbell*, 461 U.S. 458, 466 (1983) (quoting 42 U.S.C. § 405(a)).  While the regulations permit an ALJ to use "any of the measurement methods recognized and endorsed by the professional organizations" to satisfy the elements of Listing 112.05, Mental Retardation, *see* 67 Fed.Reg. 20018, 20022, basic due process mandates that the plaintiff be advised of the measurement methods to be utilized and his/her requisite burden of proof. Unquestionably, procedural due process is applicable to adjudicative administrative proceedings such as Social Security disability hearings before an ALJ.  *Richarson v. Perales*, 402 U.S. 389, 401-402 (1971).  This is so because the right to a hearing necessarily implies

---

[4] The court presumes the ALJ intended to discuss § 112.05.

the right to a fair hearing; in other words, "process which is a mere gesture is not due process." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  A hearing at which a person is allocated a burden of proof of which the person has no notice is not fair in any respect.  The record is devoid of any evidence that the plaintiff had notice that the ALJ intended to require him to demonstrate deficits in adaptive functioning in two of the aforementioned areas to meet the Listing.  Consequently, the court concludes that the ALJ erred as a matter of law by failing to notify the plaintiff of the measurement methodology he intended to utilize and to notify the claimant of her burden of proof regarding the requisite deficits of adaptive functioning necessary to meet the Listing.

More importantly, the record is replete with evidence of M.J.A.B.'s continued academic struggles, short attention span, and lack of age-appropriate thinking and reasoning abilities.  For example, the medical records from a clinical psychologist who has evaluated M.J.A.B. on at least three occasions indicate that, even when M.J.A.B. takes his medication as prescribed, his "general cognitive ability is within the Extremely Low range of intellectual functioning."  (R. 420-421.)  Dr. Kline assessed that "M.J.A.B. may experience great difficulty keeping up with his peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities," that his ability to sustain attention, concentrate, and exert mental control is in the borderline range, and that his ability to process simple or routine visual material without making errors is in the extremely low range when compared to his peers. (R. 421-422.)  In addition, Dr. Kline found that M.J.A.B. suffers from mood changes, depression, and grief.  (R. 422.)  Jeff Justice, M.J.A.B.'s counselor, also noted that

M.J.A.B. is in special education classes with accommodations and that he receives additional tutoring and assistance from tutors and his grandmother "to no avail." (R. 415.) School records also indicate that, even with accommodations and special education assistance, M.J.A.B.'s academic performance has steadily worsened over the course of his childhood. (R. 245, 256, 272.)

Despite the longitudinal treatment history, the ALJ completely ignores evidence which contradicts his finding that M.J.A.B.'s "mental impairment does not cause the required deficits in adaptive functioning to meet the requirements of Listing 12.05." (R. 15.) When concluding that M.J.A.B. does not meet the Listing, the ALJ merely relies on the opinion of Dr. William H. Simpson, a non-examining physician, and the diagnostic impression of Dr. Randall Jordan, a consultative psychologist, that M.J.A.B. has "Borderline Intellectual Functioning (based on functional performance and achievement test, intelligence certainly falls in MR range)." (R. 403.) The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury*, 957 F.2d at 840-841.

When determining M.J.A.B.'s mental impairment does not cause the required deficits in adaptive functioning, the ALJ does not explain what weight he gives the evidence and why he relies on some evidence but not other evidence. Without an explanation of the weight accorded by the ALJ to all of the various medical opinions and other evidence, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of

the claim is rational and supported by substantial evidence.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*.  The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings.

## VI.  CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 15th day of October, 2012.


_____/s/Terry F. Moorer_____
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE